## SUPREME COURT.

JOHN V. L. OVERBAGH and others vs. JOHN M. PATRIE.

A sixth sale reservation, contained in a lease in fee, is void; otherwise, in a lease for years or for lives.

Where the payment of such sixth sale is made a condition subsequent, the condition is void and the estate stands divested of such condition.

(*This decision applies in principle to the quarter sales contained in the Van Rensselaer leases in fee, in the Manor of Rensselaerwyck.*)

*Albany General Term, February* 1850.—*Present, Justices* WATSON, PARKER and WRIGHT. This was an action of ejectment, tried before Mr. Justice WILLARD, at the Albany circuit, in October 1847. The suit was brought to recover a farm lying in Coeymans, in the county of Albany, which the plaintiffs claimed in fee. The defendant pleaded the general issue.

The plaintiffs showed a patent from Queen Anne to Andreas Coeymans and others, bearing date the sixth day of August, 1714, under which the premises in question became the property of Isaac D. Verplanck, who devised all his interest in the same to the plaintiffs on the 26th day of June, 1828. On the 6th day of June, 1815, an indenture was executed by which the farm in question was leased in fee by said Isaac D. Verplanck to Henry Arnold and James H. Arnold, their heirs and assigns

forever, in consideration of five shillings and the yearly rents, covenants and conditions therein contained. An annual rent of seventeen dollars was reserved, after which there was the following provision:

" And the said party of the first part doth hereby further save and reserve unto himself, his heirs and assigns, the one equal sixth part of all purchase or consideration moneys or other things in lieu thereof, arising or that may arise, by or from the selling, demising, assigning, or anyhow disposing of the said premises hereby granted, or any part thereof, by the said party of the second part, his heirs, executors, administrators and assigns; and when and as often as the same shall be sold, demised, assigned or otherwise disposed of; and the said party of the second part for himself, his heirs, executors, administrators or assigns, doth *covenant, grant and agree* to and with the said party of the first part, his heirs and assigns, that he and they will well and truly pay or deliver unto the said party of the first part, his heirs or assigns, the said *equal one-sixth part* of the said moneys or other things in lieu thereof, arising or which may arise by, from, or out of, every such sale, demise, assignment or other disposition aforesaid; and further, that prior to any such sale, demise, assignment or other disposition aforesaid, the said party of the second part, his heirs or assigns, shall and will make an offer in writing unto the said party of the first part, his heirs or assigns, of the same premises, or such part thereof, and for such estate therein as the said party of the second part, his heirs or assigns shall intend to dispose of, specifying the same, and the price, value or consideration which the said party of the second part, his heirs or assigns is or are willing to take for the same: and the said party of the first part, his heirs or assigns, on his or their part, shall, within twenty-one days, pay or deliver such price, value or consideration, after deducting the said equal sixth part thereof, and the arrears for rent, if any there be, unto the said party of the second part, his heirs or assigns, then and in such case the said party of the second part, his heirs or assigns, shall and will, forthwith after such payment or delivery made, well and sufficiently convey and assure unto the said party of the first part, his heirs or assigns, the said premises, or the part thereof so offered, and for such estate therein as shall have been in that behalf specified. Provided, always, that if the said party of the first part, his heirs or assigns shall not, within the said twenty-one days, for that purpose limited, agree to take and accept the said premises, or the part thereof so offered as aforesaid, at such price, value or consideration as aforesaid, and shall not, within the said twenty-one days, pay or deliver such price, value or consideration, after such deduction thereout as aforesaid, unto the said party of the second part, his heirs or assigns, then it

shall be lawful for the said party of the second part, his heirs or assigns, to sell, demise, assign or otherwise dispose of the said premises, or the part thereof so offered, unto any person or persons whomsoever. Provided, nevertheless, *and these presents are on this express condition*, that every sale, demise, assignment or other disposition of the said premises hereby granted, or any part thereof, by the said party of the said second part, his heirs or assigns, to any person or persons other than to the said party of the first part, his heirs or assigns, or other than by process or compulsion of law for the consideration of money or other things in lieu thereof, *shall be utterly void* and of no effect in law or equity, unless such offer thereof shall have been made and not accepted or complied with as aforesaid, and unless the said party of the second part, his heirs or assigns, or the person or persons to whom such sale, assignment or other disposition shall have been made, shall, within twenty-one days thereafter, well and truly pay or deliver unto the said party of the first part, his heirs or assigns, the said equal sixth part of the said price value or consideration for which the said premises, or any part thereof, as the case may be, shall have been offered to the said party of the first part, his heirs or assigns, together with all arrears of rent which may be their due.

" Provided further, and these presents are upon the further condition that every sale of said premises, or any part thereof, by process of law against the said party of the second part, his heirs, executors, administrators or assigns, shall also be void and of no effect, unless the purchaser or purchasers thereof shall, within twenty-one days after such sale, pay unto the said party of the first part, his heirs or assigns, a sum of money equal to one-sixth part of the sum for which the said premises, or the part thereof so sold, shall be struck off or sold by virtue of such process, to the purchaser or purchasers.

Then followed a condition against the erection of any mill, mill dam, or any other work or building whatsoever, upon any kill, creek, stream or run of water, and a prohibition of waste, also a provision against cutting and carrying off, for sale, any wood or timber.

There was the usual provision for re-entry in case any of the conditions should not be performed and fulfilled.

It was proved that James Arnold was formerly in possession of the land, and claimed to own it, under the said lease, together with James H. Arnold his son, and died in possession nineteen or twenty years before the trial. That one Bishop bought from the widow of Arnold and her heirs, and went into possession, and the defendant bought from Bishop and entered upon the farm. That the defendant claimed to hold it by " an everlasting lease."

The counsel for plaintiff did not claim a violation of any other condition of said lease, except these relating to the sale of said premises by the lessees, &c., the giving notice of intention to sell, &c., and reserving the one-sixth part of the purchase-money on such sale.

The defendant's counsel moved for a non-suit on the ground that the defendant had held adversely more than twenty-five years. The court overruled the motion, and defendant's counsel excepted.

The counsel for defendant then renewed his motion for a non-suit on the following grounds:

1. That there was no proof of any breach of condition.

2. That the condition in said lease, for the violation of which the plaintiff's claim to recover, manifestly contravenes public policy, and is injurious, beyond all doubt, to the interests of the state, and is therefore void.

3. That the said condition is repugnant to the grant of a lease held in fee, and is therefore void.

4. That the condition is in contravention of the terms, or at least of the spirit and intention of the statute concerning tenures. It is, in substance, a fine for alienation and void at common law and by statute.

But the justice overruled these objections and denied the motion, and directed the jury to find a verdict for the plaintiffs; to which several decisions the defendant's counsel excepted. The jury accordingly found a verdict for the plaintiffs, and the defendant moved for a new trial.

A. TABER, *for defendant.*

S. STEVENS, *for plaintiffs.*

By the Court, PARKER, Justice.—By the indenture in question, Isaac D. Verplanck reserved the right to receive, and the lessees promised to pay one-sixth part of the purchase money, whenever the premises should be sold by the lessees, their heirs or assigns. He also reserved a pre-emption right to the property, at a deduction of one-sixth of its price or value. The plaintiff claimed at the trial, to recover, on the ground that the property had been twice sold without paying over the "sixth sale" reserved; and that in both instances the sales had been made without having first offered to sell the farm to the lessor on the terms prescribed in the lease. If these were valid conditions, the forfeiture was incurred and the plaintiffs had a right to re-enter.

I think the only question here presented is, whether the sixth sale reservation was valid. The forfeiture of one-sixth of the purchase-money was to be incurred whether the sale was made to the lessor or to a third person. The lessees could not, therefore, comply with the conditions of

the lease by first offering to sell for a reasonable price to the lessor, they were required to go further, and to submit to a sale to him for five-sixths of the value.  If, therefore, the reservation of the sixth sale was invalid, it follows that the right of pre-emption on such a condition, was also void.

The question is an important one.  Reservations of this description, generally known as "quarter sales," "sixth sales," and "tenth sales," have been frequently made in perpetual leases in fee.  The legal title to hundreds of farms now depends upon their validity; and though it may be true that forfeitures for a breach of such conditions have been rarely enforced, the question involved is none the less important in principle. It is perhaps because the claim to the quarter sale has been generally compromised for a small sum, much less than the cost of testing its validity, that this question has been so rarely, if ever, brought before the courts of this state for examination.

It is claimed, on the part of the plaintiffs, that this question has been decided in the late Supreme Court of this state.  If so, we are bound by such authority, and shall not have occasion to discuss the principle.  It is important, therefore, that we first ascertain whether it is an open question.

The case principally relied on by the plaintiffs, is *Jackson* v. *Schutz*, (18 John. R. 174.)  That, like this, was an action of ejectment to recover possession for an alleged forfeiture of the conditions of a perpetual lease. In addition to the reservation of an annual rent, it was provided that in case the party of the second part was minded to sell the farm, he should first offer the pre-emption to the party of the first part; and that the party of the second part should not sell without leave first obtained from the party of the first part, under his hand and seal, and on every such sale so obtained, was to pay to the latter *a tenth* part of the money for which said farm should be sold.  The lessee assigned the lease and premises without any license from the lessors, and without offering the pre-emption and refusal to them, or paying them the one-tenth of the price of such assignment.  A verdict was taken for the plaintiff by consent, subject to the opinion of the Supreme Court, which gave judgment for the plaintiff.  The judges, however, assigned different reasons for their respective opinions.  Mr. Justice PLATT placed his decision upon the ground that all the violated conditions were lawful, and held that a reservation of a tenth sale was valid.  Chief Justice SPENCER said he thought the plaintiff was entitled to judgment " on the ground that the condition giving the lessor a right of pre-emption, is a lawful condition ; and not having been complied with, the forfeiture had been incurred."  And he added, "that on the other parts of the case it was not necessary, nor did

he mean to express any opinion." No doubt has been entertained of the correctness of the judgment rendered in that case, because the condition giving the right of pre-emption was lawful. It was not necessary that the court should go further and express an opinion upon the validity of the other conditions, nor did they do so. I think it clear, therefore, that the reasons assigned by Mr. Justice PLATT, was his own opinion only, and not the opinion of the court.

This case last cited, is the only one I have found in the reports of this state, where any judge has discussed, or expressed an opinion upon, the validity of such reservation in a lease in fee. In all the other cases, the question has arisen on leases for lives or for years.

In *Jackson ex dem. Schuyler* v. *Corlis*, (7 John. R. 531,) a lease for 21 years contained a quarter sale reservation on which ejectment was brought, the premises having been sold under an execution issued on a judgment confessed by the lessee. The court held that the covenant applied only to voluntary sales; and it not appearing that the judgment was fraudulently confessed, judgment was given for the defendant.

*Jackson ex dem. Stevens* v. *Silvernail*, (15 John. 277,) was ejectment upon a lease *for lives*, with a covenant not to sell without permission of the lessor, and a clause of forfeiture for non-performance of covenants; and it was decided that a lease of part of the premises for 20 years was not a breach of the covenant, and that nothing short of an assignment of the whole estate would work a forfeiture. It was also held, that a sale of the whole premises under a judgment and execution would not work a forfeiture, there being no fraud or collusion on the part of the lessee.

*Jackson ex dem. Livingston* v. *Groot*, (7 Cowen, R. 285,) was also ejectment upon a lease *for lives*, and the only question was whether the premises were forfeited by violating the covenant of tenth sale. The court held the covenant valid, and that it extended to every voluntary alienation, whether by the lessee or his assigns.

The next case was that of *Jackson ex dem. Livingston* v. *Kipp*, (3 Wend. R. 230,) which was also ejectment upon a lease *for lives*, where the Supreme Court reiterated the doctrine that a fifth sale covenant was not broken by a *bona fide* sale of the premises under an execution.

In *Livingston* v. *Stickles*, (8 Paige R. 398,) it was covenanted, in a *lease for lives*, that the lessee should not dispose of his estate without the written consent of the lessor, and that on every such sale he should pay to the lessor the tenth part of the purchase-money. The lessee contracted to sell the premises, indemnifying against the lessor's claim for the tenth sale, and the purchaser took possession, paid the principal part of

the purchase-money to the lessee, but received no actual transfer of title. A bill filed to enforce the payment of the tenth sale was dismissed by the chancellor, on the ground that the remedy, if any, was at law and not in equity. In giving his opinion, the chancellor said, "I prefer to put my decision in this case, distinctly upon the ground, that these agreements in the nature of fines upon alienations, are inconsistent with the spirit of our free institutions, and injurious to the community. And although this court has no right to interfere with such contracts, so far as the laws of the state sanction their validity, it ought not to interpose its extraordinary jurisdiction to enforce the rights of the landlord, in cases where he has not by his contract secured to himself a legal right, as contradistinguished from an equitable claim, to enforce a hard bargain for which the law gives him no right of action." That decree was affirmed in the Court for the Correction of Errors, (7 Hill, 253,) upon the ground that the lessor's right to be paid the tenth sale was incomplete, the lessee not having parted with his legal interest in the premises, and that the former was entitled to no aid in equity. In giving his opinion in the Court of Errors, Ch. J. NELSON, remarked, that "these covenants, though in restraint of alienation, have been repeatedly held lawful and binding upon landlord and tenant," and cited *Jackson* v. *Silvernail*, (15 John. R. 278;) *Jackson* v. *Schutz*, (18 John. R. 174,) and *Jackson* v. *Kipp*, (3 Wend. 230.) And again he said, (page 257,) that " in *Jackson* v. *Schutz*, (18 John. R. 174,) the covenant was a good deal discussed and its legality established." These general remarks, without a careful examination of the cases thus cited, might create a very erroneous impression. I have already shown that *Jackson* v. *Schutz*, decides nothing as to the legality of such a covenant; and that all the other cases cited, arose on leases *for lives or for years*. As the case of *Livingston* v. *Stickles*, did not arise on a lease in fee, it was not necessary for the learned Chief Justice to distinguish between the case of *Jackson* v. *Schutz*, and the other reported cases.

I have thus reviewed all the cases in the reports of this state, where suits have been brought to enforce a forfeiture of the land for non-payment of quarter, sixth and tenth sales. In every instance, the suit was brought upon leases *for lives* or *for years*, with the single exception of *Jackson* v. *Schutz*, where the question was on a lease *in fee*. In *Livingston* v. *Stickles*, the chancellor said, "these covenants and conditions in restraint of the alienation of *leasehold* property have been sustained by the courts, while they have been considered absolutely void in conveyances *in fee*." It is evident this language was used by the chancellor

with reference to the lease for lives then before him, and that he did not intend to include leases in fee in the general term "leasehold property."

It is now well settled, and was conceded on the argument, that reservations in the nature of fines upon alienation are valid in leases for lives and for years; but even in such leases, our courts have always held, as appears by the cases above cited, that nothing short of a violation of the covenant on the most literal and rigid interpretation, would subject to a forfeiture. Nor have the English courts been less solicitous to protect against such injustice. (See *Crusoe* v. *Bugby*, 3 Wils. 234; 2 Wm. Bl. 776; *Doe* v. *Hogg*, 4 Dowl. & Ryl. 226; *Fox* v. *Swan*, Styles, 482; *Doe* v. *Bevan*, 3 Maul & Sel. 353; *Doe* v. *Carter*, 8 Durn. & East. 57. 300; *Doe* v. *Powell*, 3 Barn. & Cres. 308; *Doe* v. *Payne*, 1 Stark R. 86; Platt on Cov. 407, 414; *Church* v. *Brown*, 15 Ves. 265.)

Having come, therefore, to the conclusion that the question whether such a condition is valid in a lease in fee has not been decided in this state, I proceed to examine it on its merits by the test of common law rules and statutory enactments.

It is first necessary to understand the precise legal character of the instrument in which the sixth sale was reserved. We speak of it ordinarily as a lease, and we call the parties to it lessor and lessee. This is proper, because a perpetual annual rent is reserved, with the right of re-entry for non-payment. But these words do not convey an adequate idea of it. It is a grant of an estate of inheritance, or a fee simple. The conveyance was to the party of the second part, his heirs and assigns forever. The words of perpetuity necessary, as the law stood at the date of the instrument, to convey an estate of inheritance were thus used "Tenant in fee simple is he who hath lands or tenements to hold to him and his heirs forever," (Litt. Ten. 1.) It is not a fee simple absolute, but a fee simple conditional—the estate depending on conditions subsequent.

Blackstone says (2 Black. Com. 81,) "if a man grant an estate in fee simple, reserving to himself and his heirs a certain rent; and that if such rent be not paid at the times limited, it shall be lawful for him and his heirs to re-enter and avoid the estate. In this case, the grantee and his heirs have an estate upon condition subsequent, which is defeasible if the estate be not strictly performed." And this definition is now substantially recognized by the Revised Statutes (1 R. S. 717,) which provides that "every estate of inheritance, notwithstanding the abolition of tenures, shall continue to be termed a fee simple or fee." When not defeasible or conditional it is termed a fee simple absolute.

The estate conveyed is also a *freehold*, that term applying equally to an estate of inheritance and an estate for life, (4 Kent Com. 23 ; 2 Bl. Com. 8, n 4.)

It is objected that the condition is repugnant to the grant of a leasehold estate in fee in the same instrument, and is therefore void.

"Conditions are void when they stipulate for what is repugnant to the language of the grant: as that a man who is a lessee to him and his assigns shall not assign ; or, that which is repugnant to the estate : as that a tenant in tail shall not suffer a common recovery ; or, that which is against the policy of the law : as an unreasonable restraint on trade, on marriage, on the power and right of alienation or a stipulation which is immoral," (2 Preston on Abstracts of Title, 193.)

The general rule on this subject is thus stated by Chancellor Kent : "Conditions are not sustained when they are repugnant to the nature of the estate granted, or infringe upon the essential enjoyment and independent rights of property, and tend manifestly to public inconvenience. A condition annexed to a conveyance in fee or by devise, that the purchaser or devisee should not alien, is unlawful and void. The restraint is admitted in leases for life or years ; but it is incompatible with the absolute right, appertaining to an estate in tail or in fee. If the grant be upon condition that the grantee shall not commit waste, or not take the profits, or his wife not to have her dower, or the husband his curtesy, the condition is repugnant and void, for these rights are inseparable from an estate in fee," (4 Kent Com. 113.) Lord Coke says this rule applies to a devise, "grant, release, confirmation, or any other conveyance whereby a fee simple doth pass," (Co. Litt. 223, a.) And that the case put by Littleton of a feoffment of land is only by way of example ; for if a man be seized of a signory, or a rent, or an advowson, or common, or any other inheritance that lieth in grant, and by his deed granteth the same to a man and to his heirs upon condition that he shall not alien, it is void," (Co. Litt. 223.)

The rule is laid down in Sheppard's Touchstone, as follows : "If the condition be that the feoffee or grantee shall not alien the thing granted, to any person whatsoever, *or that if he do so alien to any person, that he shall pay a fine to the feoffor*, these conditions are void as repugnant to the estate," (Shep. Touch. 129 ; Co. Litt. 223.)

It was indeed held that a grantee might be restrained from alienating for a particular time (2 Leon. 82 ; 3 Leon. 182 ;) and to a particular person named in the conveyance, (1 Shep. Touch, 129.) But Chancellor Kent thought it very questionable whether even such a condition would be held good at this day, (4 Kent Com. 131.) In *Bragg* v. *Tan-*

*ner,* decided in B. R. 19, Jac. 1 (1622,) it was held by Justices Doddridge and Chamberlain, that if a feoffment be on condition that if the feoffee alien, he shall pay £10 to the feoffor, that this is a good condition. But the Ch. Justice and Justice Houghton held the contrary, "for then this shall be a circumvention of the law." The manuscript case is referred to in Shep. Touch. 129. In case of leases for lives and for years, the restraint is permitted, because by the provisions of the lease the property is the revert to the lessor at the expiration of the term. (Co. Litt. 223, *a.*)

In the case under consideration, the whole estate was granted in fee. None remained in the grantor. He retained no interest on which a judgment would have been a lien. (*Payn* v. *Beal,* 4 Denio, 405.) This case overruled that of *The People* v. *Haskins,* 7 Wend. 463, where a contrary doctrine was held. The same question had been discussed, but not decided, in the late Court for the Correction of Errors, in *Huntington* v. *Forkson,* 6 Hill, 149.

It is said that in this case the estate may be terminated by the re-entry of the grantor for non-payment of rent. But it is no estate in the grantor, that he may by possibility have the right to re-enter for breach of a condition subsequent. "If A. has only a possibility of reverter, as in the case of a qualified or conditional fee at common law, he has no reversion." (4 Kent. Com. 353 ; 2 Preston on abstracts, 83.) To authorize him to impose a restraint upon alienation, he must have a right to the reversion of the estate by its limitation, which *Littleton* calls a condition in law. (Litt. § 380 ; 1 Just. 234 ; 4 Black. Com. 155.) In the latter case the estate reverts when the contingency happens, without any act done by the person in expectancy. In the former case the law permits the estate to endure beyond the time when such contingency happens, unless the grantor or his heirs or assigns take advantage of the breach of the condition, and make either an entry or a claim in order to avoid the estate. (Litt. § 347 ; 4 Black. Com. 125.)

There is no difference in principle between a condition that the lessee in fee shall not convey, and a condition that, when he conveys, he shall pay to the lessor one-sixth of the purchase-money. Both are in restraint of alienation. The first controls absolutely the whole estate, the last but one-sixth part of it. When the farm shall have been six times sold, its whole value will be surrendered, though every condition shall have been performed. Such conditions differ only in degree. If the latter could be sustained, it would only be encouraging an evasion of the rule that declares the former void.

I do not think it necessary to enquire what was the common law of

England on this subject previous to the passage of the statute of *quia emptores*, &c. in 1829, 18 Ed. 1 ch. 1 ; or if the common law was modified by that act, whether that act was ever in force in this country. (1 R. L. 41; 18 John. R. 179.) The statute *quia emptores* was virtually re-enacted in this state in the first section of the act concerning tenure, passed 20th February, 1787, which enacts that "it shall forever hereafter be lawful for every freeholder to give, sell or alien the lands or tenements whereof he or she is, or at any time hereafter shall be seized in fee simple, or any part thereof, at his or her pleasure, so always that the purchaser shall hold the lands or tenements so given, sold or aliened of the chief lord, if there be any, of the same fee, by the same services and customs by which the person or persons so making such gift, sale or alienation before held the same lands and tenements." The common law exists here under the same statutory modification as in England.

I think, therefore, that the whole estate having been granted in fee, the restraint imposed upon alienation was repugnant to the grant, and is void, and the void condition being a condition subsequent, the estate stands divested of the condition. (1 Shep. Touch. 129; 3 Com. Dig. 97, condition D.; 5 Co. Litt. 226 *b*, 223 *a*.)

2. It is also insisted by the defendant's counsel that the sixth sale reservation was a fine for alienation, in contravention of the act abolishing fines for alienation, and was therefore void.

Fines for alienation were abolished in England in 1660, by 12 Chas. 2 chap. 24. The only exceptions made by that statute were of the king's tenants *in capite* and of the tenure by " copy of court roll," usually called " copyhold estates." That tenure was founded on immemorial custom, which was different on different manors, and has never existed in this country. Even in copyhold estates the fine upon alienation is now limited in England to two years improved value of the estate. (4 Black. Com. 77; 2 Ch. R. 134.) At the time of the passage of that statute, this state was a Dutch province, and did not become an English colony till 1664. The second act of the first colonial Legislature ever held in the province was designed to divest tenures of all feudal incidents, and especially all fines and restraints upon alienation. It was passed in April 1691, and provided " That all lands and heritages within this province and dependencies, shall be free from all fines, licenses upon alienations, and from all heriots, wardships, liveries, primiers, seizins, year and day and waste escheats, and forfeiture upon the death of parents and ancestors, natural, unnatural, casual and judicial, and that forever ; cases of high treason only excepted." (Bradford Colonial Laws, 1, 4.) But that act was six years afterwards repealed by the English crown. In 1787,

however, on the organization of the state government, the "act concerning tenures" was passed, by which all feudal services and incidents were abolished by name, and which provided that "all *fines for alienations*, seizures and pardons for alienations, tenure by homage and all charges incident or arising by reason of wardship, livery, &c. &c., shall be and hereby are likewise declared to be taken away and discharged, from the said 30th day of August, 1664."

This statute was in operation when the lease in question was executed. It was repealed by the Revised Statutes, (3 R. S. 129,) and sections 3 and 4, 1 Revised Statutes, 714, were substituted in its place. The third section declares all lands within this state to be allodial, subject only to the liability to escheat, and that the entire and absolute property is vested in the owners according to the nature of their respective estates, and that all feudal tenures of every description, with all their incidents, are abolished. The 4th section provides that the abolishing of tenures should not take away or discharge any rents or services certain, which had been or might be created or reserved, &c. The very learned and able revisers expressed the opinion that the act of 1787 was unnecessary, and that no feudal tenures had existed here before its enactment, (Reviser's notes, 3 R. S., 2d ed. 564.) The correctness of this opinion was questioned on the argument by the defendant's counsel, who claimed that feudal tenures had existed here and were of Dutch origin, (1 O'Callaghan's Hist. New Neth., 117, 118, 120, 127, 197, 201, 235, 236, 325, 326, 435-6, 445-6, 456, 466; 2 id., 250-1, 179; Hallam's Middle Ages, vi. ch. 2, part 1, p. 76, 80, 352, note; Sheller's Revolt of Neth., ch. 1 and 2; 1 Robertson, 188, &c. n.; 8 Litt. Ten., § 185; 2 Black. Com. 54; Jac. Law Dic., title "Courts Baron," "Purveyor." Hallam's Mid. Ages, 6 ch., 2 part, p. 352; id., 80, 424, 90, 78.) If the act of 1787 was unnecessary, the provision of the Revised Statutes, abolishing all feudal tenures of every description, with all their incidents, must have been equally so.

It is insisted that the 6th sale reservation is not a "fine for alienation," within the language of the act of 1787; and that the statute was intended to apply only to such fines as are incident to feudal tenure, and not to a sum of money agreed to be paid by a purchaser on a subsequent sale. Sheppard says "a fine was taken for an income or a sum of money paid at the entrance of a tenant into his land," (Shep. Touch. 1.) A fine for alienation was originally an attendant or consequence of tenure by knight service. The fine became due to the lord for every alienation, whenever the tenant had occasion to make over his land to another, (4 Black. Com. 55.)

If not technically a fine upon alienation, the sixth sale reservation is in the nature of a fine upon alienation. Such is the language generally used by our courts with reference to such a condition. If there were no feudal tenures nor their incidents here, then that part of the act of 1787, abolishing fines for alienation, has no practical application, unless it applies to a condition like this. When Sheppard says, "if the condition be that if the feoffee do alien he shall pay a fine to the feoffor, the condition is void," (1 Shep. Touch. 129,) he certainly uses the word as applicable to a sum of money agreed to be paid on alienation, and in a sense broad enough to extend to this sixth sale reservation. I do not see how what was once abolished by statute when it existed, if at all, as an incident of feudal or military tenure, can be virtually restored by an agreement between the parties.

A sixth sale reservation, if not a fine for alienation within the letter of the statute is certainly an evasion of its spirit and fraught with all the evils intended to be corrected by it.

3. It remains to consider whether the condition is void on the ground that it is against public policy.

I do not deem it necessary to a decision of this cause to go into an examination of the feudal system, its origin, its history and its consequences upon the present tenure of land. It is enough to say, it was a system originating in a military age, and well adapted to its necessities; but utterly unsuited, every vestige of it, to the institutions under which we live, and to the personal independence and equality of political rights enjoyed by our citizens. The tenant no longer looks to his lord for protection against lawless aggressions, nor does the lord depend upon the military services of his tenant. There are no longer courts baron, nor homage, nor fealty, nor knight service. The reasons why neither the lord nor the tenant could change their relations with each other without mutual consent, ceased, centuries ago, with the necessities which imposed them. The progress of man in intelligence, in knowledge, in the arts of peace and in political advancement, now calls for tenures in accordance with perfect political equality, and entire personal freedom; and if there be vestiges of feudal tenure still remaining here, they should be eradicated as speedily as is consistent with a strict regard to the rights of property of those concerned.

Quarter sales, sixth sales, and tenth sales, and all fines for alienation or sums required to be paid in the nature of fines upon alienation have long been regarded as prejudicial to the public interests. Some of their evils are well stated in a report made to the Legislature by Messrs. Spencer and Van Ness in 1812, (see Assembly Journal of 1812, page 110.)

It is the policy of the law that lands shall not be withdrawn from commerce ; but these conditions tie up estates by a species of perpetual entail, from which a temporary relief can only be obtained by the payment of a very large price for the indulgence.   By the common law, the right of alienation could not be suspended for a longer time than twenty-one years and nine months, after a life or lives in being; and the Revised Statutes do not allow the absolute power of alienation to be suspended by any limitation or condition whatever, for a longer period than during the continuance of two lives in being at the creation of the estate. But here is a restraint upon alienation to continue for all future time. As often as the owner shall find it necessary to sell, age after age, and century after century, at every alienation, one-sixth of the purchase-money must be paid to the remote representatives or assigns of the lessor.   After twelve alienations, they will have received twice the improved value of the farm, in addition to the price paid on the original purchase.   Yet their claim will be in no respect lessened—the demand will be insatiable—its existence interminable.

Such conditions have the effect of preventing a change of occupation. They require the son to live upon, and cultivate the same farm his father has tilled, though he may be unfitted for the employment, and may have been designed by nature for some other calling better adapted to his taste and capabilities.   He is denied the opportunity to go abroad into the world to reap the rewards of his enterprise and industry, except at the sacrifice of a large share of the estate made valuable by the toil and industry of his fathers.   In a land where the professions and trades are open to all, he is subjected to all the discouragements of caste. A freeman and a freeholder, he is not at liberty to dispose of his own property.

Such conditions depreciate the value of property and discourage industry.   It can hardly be supposed a purchaser from the tenant will pay the full value for a farm, when he knows he will be under the necessity of giving to a landlord one-sixth of what he shall receive, whenever he shall be disposed to sell it again.   Nor will an owner consent to make permanent improvements or valuable erections, subject to such a loss on them by alienation.   The improvement of the country is largely concerned in defeating a condition thus charged upon land for all time to come.

I think no person can be found the advocate, and few persons the apologists, of such a condition, at the present day ; a condition so unconscionable, that the cases are exceedingly rare, in which the landlord has ever sought to enforce it, and so odious, that a distinguished writer in the American Review, (2 Am. Rev. 593,) says, " after a new owner

had come into possession, having paid the full value of the property, if he should have occasion to sell again for the like value, we should envy no man his conscience or his character, who, under this provision would take from him the full quarter part of his purchase.

It is said that this condition formed a substantial part of the consideretion for which the grant was made. If this were so, it would not affect the legal question. Where a physician covenants, in consideration of $1000 paid to him, never to practice medicine again in the state, the covenant is void notwithstanding the consideration, as being in restraint of trade and against the policy of the law, (*Nobles* v. *Bates*, 7 Cowen, 307 ; 7 Mod. 230 ; 10 id. 27, 85, 130 ; 2 Saund. 156, a. n. 1.) But though in law this condition is regarded as a part of the consideration for the grant, it was esteemed of but little value when the lease was executed. Upon this subject Messrs. Spencer and Van Ness, say, in their report above referred to, " covenants and conditions, which coerce the tenant to pay a penalty for leave to change his residence, are generally without consideration; for it cannot be pretended that in settling terms of the lease, the landlord took a lower rent on the contingency that his tenant would change his mind and become disposed to part with his lease. It may also be remarked, that the tenant in entering into stipulations to pay a fine or a quarter sale, or alienation, does so under circumstances which may induce him to believe he will never be disposed to alienate ; but his circumstances change, and a variety of unforeseen causes impel him to a change of residence. It can never be right to suffer a landlord who is not prejudiced by the alienation of his tenant, to grasp a part of his earnings for his yielding to imperious circumstances, or for his changing his mind."

It is within the legitimate scope of judicial inquiry to ascertain whether such reservations are against public policy ; and I have, therefore, thought it proper to look somewhat into their nature and character. Upon this question it seems to me, there is no good reason for a difference of opinion.

I need not here repeat the authorities bearing upon this question, which I have referred to under the first point. Upon both principle and authority such a condition is condemned as against the policy of the law. I think there should be a new trial, costs to abide the event.

New trial granted.

NOTE.—Although the four preceding decisions are not, strictly speaking, practice cases, yet the practical importance of their *early* publication, at least to a portion of the state, may be deemed a sufficient reason for their being inserted in this number, to the exclusion of other matter.